## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CRAIG CUNNINGHAM,** **Plaintiff,** v. The Oliver Law Group, PA, Complete Legal Plan, LLC, Consumer Capital Advocates, LLC, Global Client Solutions, LLC, Credit analyzer.net, LLC, Tony Pardo, Bert Oliver, Jenssen Varela, **Defendant** | § § § § § § § § § | **Civil Case No.** FILED SEP 2 5 2018 Clerk, U.S. District Court Texas Eastern |

### Plaintiff's Original Complaint

### Parties

1. The Plaintiff is Craig Cunningham and natural person and was present in Texas for all calls in this case in Collin County.

2. The Oliver Law Group, P.A. is a Florida entity that can be served via registered agent Bert Oliver, 1166 W. Newport Center Drive, suite 312 Deerfield beach, FL 33442.

3. Bert Oliver is a natural person and corporate officer of Oliver Law group and can be served at 1166 W. Newport Center Drive, Suite 312 Deerfield Beach, FL 33442.

4. Consumer Capital Advocates, LLC is a Florida corporation that can be served via registerd agent at Jenssen Varela, 2011 N. Ocean Blvd Apt 702, Fort Lauderdale, FL 33305 or 2900 NE 30th Street, Fort Lauderdale, FL 33306 or 3221 NW 10th Terrace # 502, Oakland Park, FL 33309.

5. Jenssen Verela is a managin member of Consumer Capital Advocates, LLC and can

be served at 2011 N. Ocean Blvd Apt 702, Fort Lauderdale, FL 33305 or 2900 NE

30th Street, Fort Lauderdale, FL 33306 or 3221 NW 10th Terrace # 502, Oakland Park,

FL 33309.

6.   Creditanalyzer.net, LLC is a Florida corporation that can be served via Reg Agent

Tony Pardo 2841 N. Ocean Blvd Apt 1102, Fort Lauderdale, FL 33308.

7.   Tony Pardo is  a natural person who can be served at 2841 N. Ocean Blvd., Apt 1102,

Fort Lauderdale, FL 33308.

8.   Complete Legal Plan, LLC is a Florida corporation that can be served via reg agent

Tony Pardo, 3320 NW 97 Way, Sunrise FL 33351 or 2841 N. Ocean Blvd., Apt 1102,

Fort Lauderdale, FL 33308.

9.   Global Client solutions, LLC is an Oklahoma corporation that can be served via

registered agent Brent Hampton, 4500 S 129th East Ave Ste 175, Tulsa, OK 74134


## JURISDICTION AND VENUE

10.  Jurisdiction.  This Court has federal-question subject matter jurisdiction over

Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal

statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has

supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas

Business and Commerce Code 305.053 because that claim: arises from the same

nucleus of operative fact, i.e., Defendants' telemarketing robocalls to Plaintiff; adds

little complexity to the case; and doesn't seek money damages, so it is unlikely to

predominate over the TCPA claims.

11.  **Personal Jurisdiction.** This Court has general personal jurisdiction over the

defendant because they have repeatedly and knowingly placed calls to Texas residents, and derive revenue from Texas residents, and the sell goods and services to Texas residents, including the Plaintiff.

12. This Court has specific personal jurisdiction over the defendants because the calls at issue were sent by or on behalf of each of the defendants and for the benefit of each and every defendant to Texas Residents, specifically the Plaintiff in this case.

13. **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District. The Plaintiff was residing in the Eastern District of Texas when he recieved a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

**THE TELEPHONE CONSUMER PROTECTION ACT OF 1991, 47 U.S.C. § 227**

14. In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding telemarketing.

15. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

16. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without

the prior express consent of the called party, unless the call is initiated for emergency
purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by
the United States, or is exempted by rule or order" of the Federal Communication
Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

17. The TCPA provides a private cause of action to persons who receive calls in violation
    of § 227(b). 47 U.S.C. § 227(b)(3).

18. Separately, the TCPA bans making telemarketing calls without a do-not-call policy
    available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

19. The TCPA provides a private cause of action to persons who receive calls in
    violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

20. According to findings of the FCC, the agency vested by Congress with authority to
    issue regulations implementing the TCPA, automated or prerecorded telephone calls
    are a greater nuisance and invasion of privacy than live solicitation calls and can be
    costly and inconvenient.

21. The FCC also recognizes that "wireless customers are charged for incoming calls
    whether they pay in advance or after the minutes are used." *In re Rules and
    Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014,
    14115 ¶ 165 (2003).

22. The FCC requires "prior express written consent" for all autodialed or prerecorded
    telemarketing robocalls to wireless numbers and residential lines.  In particular:[A]
    consumer's written consent to receive telemarketing robocalls must be signed and be
    sufficient to show that the consumer:  (1) received clear and conspicuous disclosure

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

https://www.consumer.ftc.gov/blog/2015/08/whats-deal-rachel-card-services-your-top-3-questions-answered

of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

23. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

24. The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

25. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

26. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the

TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### The Texas Business and Commerce Code 305.053

27. The Texas Business and Commerce code has an analogus portion that is related to the TCPA and was violated in this case.

28. The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

### FACTUAL ALLEGATIONS

29. The Plaintiff recieved at least 9 calls from a spoofed caller ID of 615-348-3208 to 615-348-1977 on September 13 2018 initially and later from 888-407-1534. The number 615-348-3208 was spoofed and is not a working number. The calls were initiated using an automated telephone dialing system and the first call on 9/13/2018 contained a pre-recorded message. The pre-recorded message said after a 3 second pause of dead air *"This is the award system with Visa Mastercard account services with important changes to your account before the next billing-"* at which point, the Plaintiff pressed 1 to reach a live rep and recognized the call as being one of the common *"Rachel with card services"* type of calls pitching debt relief service.

30. The Plaintiff knew this wasn't actually a represenative of Visa or Mastercard calling. Interestingly enough, the agent had some identifying personal information on the

Plaintiff referring to an old address, so they apparently bought information relating to the Plaintiff.

31. The Plaintiff was then connected with a live person who introduced himself as "Larry" and claimed he was with "credit services and asked if the Plaintiff was holding for a 0% credit card offer. Larry then asked a few qualifying questions and then transferred the Plaintiff to Consumer Capital Advocates. Larry claimed the Plaintiff would get a 0% credit card offer for 48 months.

32. The Plaintiff was then connected to an individual named Michael Young with "card services" that the Plaintiff later determined to be wit Consumer Capital Advocates who claimed to work with a full service financial firm and The agent gave his callback number of 888-407-1534. Michael claimed his company could eliminate interest rates and get some of the Plaintiff's debt forgiven. Michael then claimed that he was part of a full service law firm and an attorney would be assigned to my case whose job is to contact my creditors and negotiate with them to eliminate my interest rates. Michal then referred to the Oliver Law group as the law firm they work with to settle the Plaintiff's debts.

33. The Plaintiff was then was told about the debt relief program and how it involves a subscription to Complete Legal Plan, Credit Analyzer, an escrow account with Global Client Solutions and the services of Oliver Law Group, PA. The Defendants described their strategy of having the Plaintiff intentionlly default on his credit cards in order to secure a settlement for less than the balance owed using the services of the Oliver Law group and the other entities.

34. The Plaintiff was sent an combined service agreement bearing the Plaintiff's name

and securing the services of The Oliver Law Group, PA, Global Client Solutions, Consumer Capital Advocates, LLC, Complete Legal Plan, and Credit Analyzer, LLC as a result of the telephone call (Ex A)

35. On information and belief, Consumer Capital Advocates, LLC or entities placing calls on their behalf used equipment that has the capacity to store or produce random or sequential telephone numbers to be called and that includes autodialers and predictive dialers (each an "automatic telephone dialing system" or "ATDS") to place each and every call.

36. Consumer Capital Advocates placed calls to the Plaintiff without maintainin an internal do-not-call list in violation of 47 USC 227(c)(5) as codified in 47 CFR 64.120(d).

37. Consumer Capital Advocates, LLC was pitching "debt relief" services to reduce the Plaintiff's credit card debt using the services of the Oliver Law Group, Global Client Solutions, LLC, Credit Analyzer.net, LLC and Complete Legal Plan, LLC as detailed in the written agreement sent to the Plaintiff from the Defendants.

38. The Plaintiff was emailed an a contractual agreement to sign that described the services provided by each of the entities in paragraph 31. (See Ex A). The Plaintiff was then called multiple times a day by  Michael with Consumer Capital Advocates in an effort to get the Plaintiff to sign off on the debt relief contract creating an obligation on the Plaintiff's part to pay money to The Oliver Law Group, Global Client Solutions, CreditAnalyzer.net, and Complete Legal Plan, LLC.

39. The Plaintiff has previously sued Global Client Solutions for illegal telemarketing, and despite this, Defendant Global continues to contractually engage with entities

Global knows will make illegal telemarketing calls.

40. The Plaintiff inquired with the agents of Consumer Capital Advocates, LLC if they had an Internal Do not call policy and if they could send the Plaintiff a copy.

41. Consumer Capital Advocates, LLC never sent Mr. Cunningham any do-not-call policy.

42. On information and belief, Consumer Capital Advocates, LLCdid not have a written do-not-call policy while it was sending Mr. Cunningham calls.

43. On information and belief, Consumer Capital Advocates, LLC did not train its agents engaged in telemarketing on the existence and use of any do-not-call list.

44. Consumer Capital Advocates, LLC calls did not provide Mr. Cunningham with the name of the individual caller or the name of the person or entity on whose behalf the call was being made.

45. At no time during the call was the calling party's name mentioned naming the party on whose behalf the calls were being placed.

46. At no time were any of the calls related to any emergency purpose.

47. At no time were any of the calls placed with the Plaintiff's prior express written consent.

48. Defendants never had any reason to believe that Mr. Cunningham had consented to receive calls or texts from them.

49. Mr. Cunningham has a limited data plan. Incoming calls chip away at his monthly allotment.

50. Mr. Cunningham has limited data storage capacity on his cellular telephone. Incoming calls from Consumer Capital Advocates on behalf of their co-defendants

consumed part of this capacity.

**Willful and Knowing Actions by Bert Oliver and The Oliver Law Group, PA**

51. Bert Oliver was aware in 2018 that the Defendants Consumer Capital Advocates were
placing automamted calls with pre-recorded messages. Bert knew that the calls were
being made without consent and that most consumers did not want to recieve these
types of calls. Bert knew that Consumer Capital Advocates were placing illegal
telemarketing calls on behalf of Bert Oliver and his law firm to consumers. Despite
knowledge of the illegal calls being placed for the benefit of himself and the Oliver
Law Group, Bert executed a contract for telemarketing services provided by
Consumer Capital Advocates. Bert continued to pay and agree to buy the leads
generated by the illegal telemarketing services as contracted.. Bert had control over
the Oliver Law Group and the agreement with Consumer Capital Advocates and
knowledge of the illegal telemarketing actions of Consumer Capital Advocates to the
extent that he could terminate the contract with Consumer Capital Advocates to stop
the illegal telema rketing but refused to do so.

52. Bert continued to purchase leads and pay Consumer Capital Advocates through his
corporation the Oliver Law Group for the illegally obtained telemarketing leads. Bert
knew that Consumer Capital Advocates lacked an internal Do-not-call policy and was
placing telemarketing calls on his company's behalf regardless. Bert knew that the
Plaintiff would continue to recieve telemarketing calls by Consumer Capital
Advocates selling the servies of The Oliver Law Group as a result of not having an
internal do-not-call list.

53. The Oliver Law Group, PA is a single member entity owned and controlled primrily by Bert Oliver. Bert Oliver is the onlyexecutives and decision maker for the Oliver Law Group, PA and has the power and authority to fire employees and terminate contracts with other 3rd party vendors such as Consumer Capital Advociates. Despite knowledge of the illegal telemarketing conduct, Bert Oliver refused to terminate his contract with Consumer Capital Advocates corporation and instead Bert Oliver decided to continue to purchase telemarketing leads. Bert Oliver directed Consumer Capital Advocates to place automated calls with pre-recorded messages for his own profit and benefit. The Oliver Law group, PA and Bert Oliver are vicariously liable for all TCPA damages and Texas state law violations resulting from their contract and agreement with Consumer Capital Advocates, LLC.

**Consumer Capital Advocates and Jenssen Varela's Willful and knowing actions**

54. Jenssen Varela was aware in 2018 that the Defendants Consumer Capital Advocates were placing automamted calls with pre-recorded messages. Jenssen Varela  knew that the calls were being made without consent and that most consumers did not want to recieve these types of calls. Jenssen Varela  knew that Consumer Capital Advocates were placing illegal telemarketing calls on behalf of Jenssen Varela  and his law firm to consumers. Despite knowledge of the illegal calls being placed for the benefit of himself and the Oliver Law Group, Jenssen Varela executed a contract for telemarketing services provided by Consumer Capital Advocates. Jenssen Varela continued to pay and agree to buy the leads generated by the illegal telemarketing services as contracted.. Jenssen Varela  had control over the Oliver Law Group and the agreement with Consumer Capital Advocates and knowledge of the illegal

telemarketing actions of Consumer Capital Advocates to the extent that he could terminate the contract with Consumer Capital Advocates to stop the illegal telema rketing but refused to do so.

55. Jenssen Varela continued to sell leads and direct Consumer Capital Advocates to make illegall telemarketing calls despite knowing the calls violated the TCPA and Texas Business and Commerce Code. Jenssen Varela  knew that Consumer Capital Advocates lacked an internal Do-not-call policy and was placing telemarketing calls on his company's behalf regardless. Jenssen Varela  knew that the Plaintiff would continue to recieve telemarketing calls by Consumer Capital Advocates selling the servies of The Oliver Law Group among the rest of the defendants as a result of not having an internal do-not-call list.

56. Consumer Capital Advocates is a single member entity owned and controlled primrily by Jenssen Varela. Jenssen Varela  is the only executive and decision maker for Consumer Capital Advocates and has the power and authority to fire employees and terminate contracts with other 3rd party vendors placing telemarketing calls on its behalf. Despite knowledge of the illegal telemarketing conduct, Jenssen Varela refused to direct Consumer Capital Advocates to stop making illegal telemarketing calls and instead decided to continue to purchase telemarketing leads. Jenssen Varela directed Consumer Capital Advocates to place automated calls with pre-recorded messages for his own profit and benefit.

**Willful and Knowing Actions by Bert Oliver and The Oliver Law Group, PA**

57. Bert Oliver was aware in 2018 that the Defendants Consumer Capital Advocates were placing automamted calls with pre-recorded messages. Bert knew that the calls were being made without consent and that most consumers did not want to recieve these types of calls. Bert knew that Consumer Capital Advocates were placing illegal telemarketing calls on behalf of Bert Oliver and his law firm to consumers. Despite knowledge of the illegal calls being placed for the benefit of himself and the Oliver Law Group, Bert executed a contract for telemarketing services provided by Consumer Capital Advocates. Bert continued to pay and agree to buy the leads generated by the illegal telemarketing services as contracted.. Bert had control over the Oliver Law Group and the agreement with Consumer Capital Advocates and knowledge of the illegal telemarketing actions of Consumer Capital Advocates to the extent that he could terminate the contract with Consumer Capital Advocates to stop the illegal telema rketing but refused to do so.

58. Bert continued to purchase leads and pay Consumer Capital Advocates through his corporation the Oliver Law Group for the illegally obtained telemarketing leads. Bert knew that Consumer Capital Advocates lacked an internal Do-not-call policy and was placing telemarketing calls on his company's behalf regardless. Bert knew that the Plaintiff would continue to recieve telemarketing calls by Consumer Capital Advocates selling the servies of The Oliver Law Group as a result of not having an internal do-not-call list.

59. The Oliver Law Group, PA is a single member entity owned and controlled primrily by Bert Oliver. Bert Oliver is the onlyexecutives and decision maker for the Oliver Law Group, PA and has the power and authority to fire employees and terminate

contracts with other 3rd party vendors such as Consumer Capital Advocates. Despite

knowledge of the illegal telemarketing conduct, Bert Oliver refused to terminate his

contract with Consumer Capital Advocates corporation and instead Bert Oliver

decided to continue to purchase telemarketing leads. Bert Oliver directed Consumer

Capital Advocates to place automated calls with pre-recorded messages for his own

profit and benefit. The Oliver Law group, PA and Bert Oliver are vicariously liable

for all TCPA damages and Texas state law violations resulting from their contract and

agreement with Consumer Capital Advocates, LLC.

### Willful and Knowing Actions by Tony Pardo and  Credit Analyzer.net, LLC and Complete Legal Plan, LLC

**60.** Tony Pardo was aware in 2018 that the Defendants Consumer Capital Advocates

were placing automamted calls with pre-recorded messages on behalf of him and his

corporation Creditanalyzer.net LLC and Complete Legal Plan, LLC. Tony Pardo

knew that the calls were being made without consent and that most consumers did not

want to recieve these types of calls. . Despite knowledge of the illegal calls being

placed for the benefit of himself and the Creditanalyzer.net LLC and Complete Legal

Plan, LLC, Tony Pardo executed a contract for telemarketing services provided by

Consumer Capital Advocates and Complete Legal Plan, LLC. Tony Pardo continued

to pay and agree to buy the leads generated by the illegal telemarketing services as

contracted.. Tony Pardo had control over the entity Creditanalyzer.net LLC and

Complete Legal Plan, LLC and the agreement with Consumer Capital Advocates and

knowledge of the illegal telemarketing actions of Consumer Capital Advocates to the

extent that he could terminate the contract with Consumer Capital Advocates to stop the illegal telema rketing but refused to do so.

61. Tony Pardo continued to purchase leads and pay Consumer Capital Advocates through his corporation the Creditanalyzer.net LLC and Complete Legal Plan, LLC for the illegally obtained telemarketing leads. Tony Pardo knew that Consumer Capital Advocates lacked an internal Do-not-call policy and was placing telemarketing calls on his company's behalf regardless. Tony Pardo knew that the Plaintiff would continue to recieve telemarketing calls by Consumer Capital Advocates selling the servies of Creditanalyzer.net LLC and Complete Legal Plan, LLC as a result of not having an internal do-not-call list.

62. Creditanalyzer.net LLC and Complete Legal Plan, LLC are single member entity owned and controlled primrily by Tony Pardo. Tony Pardo is the only executive and decision maker for the Creditanalyzer.net LLC and Complete Legal Plan, LLC and has the power and authority to fire employees and terminate contracts with other 3rd party vendors such as Consumer Capital Advocates. Despite knowledge of the illegal telemarketing conduct, Tony Pardo refused to terminate his contract with Consumer Capital Advocates corporation and instead Tony Pardo decided to continue to purchase telemarketing leads. Tony Pardo directed Consumer Capital Advocates to place automated calls with pre-recorded messages for his own profit and benefit. Creditanalyzer.net LLC and Complete Legal Plan, LLC and Tony Pardo are vicariously liable for all TCPA damages and Texas state law violations resulting from their contract and agreement with Consumer Capital Advocates, LLC.

63. According to the website www.completelegalplan.com, Complete Legal Plan, LLC explicitly states that the Plan administrator is "The Oliver Law Group, PA" and in the fine print states "In order to provide te simplest, most straightforward experience and deliver the hihest level of customer service to its members, Complete Legal Plan, LLC is pleased to have contracted with The Oliver Law Group, P.A. to fulfill member services and administrative functions for CLP members.

### Willful and Knowing Actions by Global Client Solutions

64. Global Client solutions was previously sued by the Plaintiff for placing illegal telemarketing calls was aware in 2018 that the Defendants Consumer Capital Advocates were placing automamted calls with pre-recorded messages. Global Client knew that the calls were being made without consent and that most consumers did not want to recieve these types of calls. Global Client knew that Consumer Capital Advocates were placing illegal telemarketing calls on behalf of Global Client and the related law firm to consumers. Despite knowledge of the illegal calls being placed for the benefit of Global Client, Global Client executed a contract for telemarketing services provided by Consumer Capital Advocates. Global Client continued to pay and agree to buy the leads generated by the illegal telemarketing services as contracted.. Global Client had control over the Oliver Law Group and the agreement with Consumer Capital Advocates and knowledge of the illegal telemarketing actions of Consumer Capital Advocates to the extent that Global Client could terminate the contract with Consumer Capital Advocates to stop the illegal telema rketing but refused to do so.

65. Global Client continued to purchase leads and pay Consumer Capital Advocates through his corporation the Global Client for the illegally obtained telemarketing leads. Global Client knew that Consumer Capital Advocates lacked an internal Do-not-call policy and was placing telemarketing calls on his company's behalf regardless. Global Client knew that the Plaintiff would continue to recieve telemarketing calls by Consumer Capital Advocates selling the servies of The Oliver Law Group as a result of not having an internal do-not-call list.

66. Despite knowledge of the illegal telemarketing conduct, Global Client refused to terminate his contract with Consumer Capital Advocates corporation and instead Global Client decided to continue to purchase telemarketing leads. Global Client is vicariously liable for all TCPA damages and Texas state law violations resulting from their contract and agreement with Consumer Capital Advocates, LLC.

### Violations of The Texas Business and Commerce Code 305.053

67. The Texas Business and Commerce code has an analogus portion that is related to the TCPA and was violated in this case.

68. The Plaintiff may seek damages under this Texas law for violations of 47 USC 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages. The calls constituted  at least 9 violations of the Texas Finance Code 305.053 and the Plaintiff should be awarded treble damages for willful and knowing violations of $1500 per call.

69. Each and every individual defendant violated 47 USC 227 by placing illegal telemarketing calls or accepting the benefits of the illegal telemarketing calls and is thus liable also under the Texas Business and Commerce Code 305.053.

70. Consumer Capital Advocates, LLC at the direction of Jenssen Varela placed calls, did not provide Mr. Cunningham with the name of the individual caller or the name of the person or entity on whose behalf the call was being made and thus violated 47 USC 227(c)(5) and in turn violated the Texas business and commerce code.

71. Consumer Capital Advocates violated 47 USC 227(b) by placing automated calls with a pre-recorded message to the Plaintiff's cell phone.

72. Consumer Capital Advocates, LLC at the direction of Jenssen Varela placed calls, did not provide Mr. Cunningham with the name of the individual caller or the name of the person or entity on whose behalf the call was being made and thus violated 47 USC 227(c)(5) and in turn violated the Texas business and commerce code.

73. Consumer Capital Advocates violated 47 USC 227(b) by placing automated calls with a pre-recorded message to the Plaintiff's cell phone.

74. The Oliver Law Group, PA at the direction of Bert Oliver hired Consumer Capital Advocates and Jenssen Varela to place illegal telemarketing calls in violation of 47 USC 227(b) and 47 USC 227(c)(5) and are jointly and severally liable for the calls in violation of Texas Business and Commerce Code.

75. Global Client hired Consumer Capital Advocates and Jenssen Varela to place illegal telemarketing calls in violation of 47 USC 227(b) and 47 USC 227(c)(5) and are jointly and severally liable for the calls in violation of Texas Business and Commerce Code.

76. CreditAnalyzer.com, LLC  at the direction of Tony Pardo hired Consumer Capital Advocates and Jenssen Varela to place illegal telemarketing calls in violation of 47

USC 227(b) and 47 USC 227(c)(5) and are jointly and severally liable for the calls in violation of Texas Business and Commerce Code.

## VICARIOUS LIABILITY

77. Defendants CreditAnalyzer.com, LLC, Consumer Capital Advocates,The Oliver Law Group, PA are also vicariously liable under the FCC's ruling according to the traditional agency principles to include actual authority, apparent authority, and ratification.

78. Defendants CreditAnalyzer.com, LLC, Consumer Capital Advocates,The Oliver Law Group, PA are liable under actual authority as they directly hired Defendant Consumer Capital Advocates to place illegal telephone calls and authorized the illegal telephone calls.

79. Defendants CreditAnalyzer.com, LLC, Consumer Capital Advocates,The Oliver Law Group, PA contracted and with Defendant Consumer Capital Advocates for the purposes of placing automated calls with pre-recorded messages to consumers.

80. Defendants CreditAnalyzer.com, LLC, Consumer Capital Advocates,The Oliver Law Group, PA is liable under apparent authority as a reasonable person would have understood that Defendant Consumer Capital Advocates as the other defendant's agent had authority to act on their behalf by placing telephone calls to consumers including the Plaintiff.

81. Defendants CreditAnalyzer.com, LLC, Consumer Capital Advocates,The Oliver Law Group, PA are liable under the theory of ratification as they knowingly acceptend the benefits and profits of the illegal conduct and approved of the illegal telephone calls to happen under the doctrines of apparent authority, actual authority, and ratification.

https://www.consumer.ftc.gov/blog/2015/08/whats-deal-rachel-card-services-your-top-3-questions-answered

82. Defendants CreditAnalyzer.com, LLC, Consumer Capital Advocates,The Oliver Law Group, PA sent the Plaintiff paperwork for consolidating his debt which explained the entire process and costs involved and included the other named defendants as sellers of goods or services in the agreement.

83. The calls in question violated 47 USC 227(b) entitling the Plaintiff to a recover of $1500 for making calls using an automated telephone dialing system and containing a pre-recorded message and 47 USC 227(c)(5) as codified by 47 CFR 64.1200 under the FCC's rulemaking authority entitling the Plaintiff to an additional recovery of $1500 for violating 47 CFR 64.1200(b) and 47 CFR 64.1200(d)(4) as the defendants failed to have a a written policy regarding telemarketing, trained personnel who engage in telemarketing, failed to identify the seller and telemarketers, and failed to maintain a do-not-call list. In total, the Defendants owe the Plaintiff $3,000 per call for violations of the TCPA.

## I.   FIRST CLAIM FOR RELIEF

### (Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))

### (Against All Defendants)

1.      Mr. Cunningham realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

2.      The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency telemarketing robocalls to Mr. Cunningham's cellular telephone number without his prior express written consent.

https://www.consumer.ftc.gov/blog/2015/08/whats-deal-rachel-card-services-your-top-3-questions-answered

3.     Mr. Cunningham is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

4.     Mr. Cunningham is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

5.     Mr. Cunningham also seeks a permanent injunction prohibiting Defendants and their affiliates and agents from making non-emergency telemarketing robocalls to cellular telephone numbers without the prior express written consent of the called party.

## II. SECOND CLAIM FOR RELIEF

### (Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))

### (Against All Defendants)

6.     Mr. Cunningham realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

7.     The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking:

a.     a written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1); [2]

b.     training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2); [3] and,

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).

c.      in the solicitations, the name of the individual caller and the name

of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. §

64.1200(d)(4).[4]

8.      Mr. Cunningham is entitled to an award of at least $500 in damages for

each such violation. 47 U.S.C. § 227(c)(5)(B).

9.      Mr. Cunningham is entitled to an award of up to $1,500 in damages for

each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

10.     Mr. Cunningham also seeks a permanent injunction prohibiting

Defendants and their affiliates and agents from making telemarketing solicitations until

and unless they (1) implement a do-not-call list and training thereon and (2) include the

name of the individual caller and BEKSTAR, LLC 's name in the solicitations.

### III. THIRD CLAIM FOR RELIEF: Violations of The Texas Business and Commerce Code 305.053

11.      Mr. Cunningham realleges and incorporates by reference each and every

allegation set forth in the preceding paragraphs.

12.      The foregoing acts and omissions of Defendants and/or their affiliates or

agents constitute multiple violations of the **Texas Business and Commerce Code**

**305.053**, by making non-emergency telemarketing robocalls to Mr. Cunningham's

cellular telephone number without his prior express written consent in violation of 47

USC 227 et seq.

---

[4] *See id.* at 425 – 26 (codifying a June 26, 2003 FCC order).

https://www.consumer.ftc.gov/blog/2015/08/whats-deal-rachel-card-services-your-top-3-questions-answered

13.     Mr. Cunningham is entitled to an award of at least $500 in damages for each such violation.**Texas Business and Commerce Code 305.053(b)**

14.     Mr. Cunningham is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053(c)**.

## IV.PRAYER FOR RELIEF

WHEREFORE, Plaintiff Craig Cunningham prays for judgment against Defendant BEKSTAR, LLC :

A.     Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.     A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

C.     An order enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.     An award of $3000 per call  in statutory damages arising from the TCPA intentional violations jointly and severally against the corporation and individual for 9 calls.

E.     An award of $1500 per call in statutory damages arising from violations of the Texas Business and Commerce code 305.053

F.     An award to Mr. Cunningham of interest, costs and attorneys' fees, as allowed by law and equity

G.     Such further relief as the Court deems necessary, just, and proper.

https://www.consumer.ftc.gov/blog/2015/08/whats-deal-rachel-card-services-your-top-3-questions-answered

Craig Cunningham
Plaintiff,

Pro-se 3000 Custer Road, ste 270-206, Plano, Tx 75075 9/24/2018